Mr. Dan Flowers Director of Highways and Transportation Arkansas State Highway Commission P.O. Box 2261 Little Rock, Arkansas 72203-2261
Dear Mr. Flowers:
This is in response to your request for an opinion on three questions concerning a possible highway bond issue. Specifically, you note that "[c]urrently, the Federal Highway Administration has an innovative financing program which allows a state to issue bonds and to pledge its future federal-aid highway funds for repayment of the bonded indebtedness. The program is commonly referred to as `Grant Anticipation Revenue Vehicles' (`GARVEE Bonds')."
You state that it is your understanding that the issuance of GARVEE Bonds and the repayment of same involve neither state taxes nor other state revenue, and that the sole source of repayment of the bonds is the State's share of the federal highway dollars which are allocated from the Federal Highway Trust Fund. You also note that the "Highway Trust Fund" derives its revenue from user fees such as federal gasoline and diesel taxes, and the Fund was created to provide a revenue source for construction and reconstruction of roads and bridges that qualify under the Federal-Aid Highway Program.
You have three questions concerning the legality of the issuance of these types of bonds, as follows:
 (1) Does the issuance of GARVEE Bonds by the Arkansas State Highway Commission and the pledge of its future federal highway funds for repayment of the bonds violate Article 16, Section 1 of the Arkansas Constitution which prohibits the State from lending its credit?
 (2) Because the GARVEE Bonds require a state to pledge future federal highway revenues which funds qualifying improvements on state highways, are the GARVEE Bonds subject to a vote of the people as provided in Amendment 20 to the Arkansas Constitution?
 (3) Are monies allocated to this agency from the Highway Trust Fund considered State `revenues' as referenced in Amendment 20 to the Arkansas Constitution?
In my opinion the answers to these questions may involve the actual facts surrounding the issuance of the GARVEE bonds. There is more than one way to structure a GARVEE bond issue. See generally, "`Grant AnticipationRevenue Vehicles'" — A New Way to Retire Debt," Federal Highway Administration Innovative Finance Quarterly, Vol. 3, No. 2 at 1-2 (discussing permanent financing GARVEEs, short term GARVEEs, and secondary GARVEEs). See also "Case Studies — Federal Highway Funds andDebt Finance, Innovative Finance Quarterly, Vol. 4, No. 3 (discussing "direct" GARVEEs and "indirect" GARVEEs). I can't come to a definitive conclusion regarding a particular bond issue without reference to the legislation authorizing it, or at least to the terms of the bond issue. I can, however, as a general matter, set out the characteristics of such bonds, and discuss the possible application of the constitutional provisions you cite.
"GARVEE" bonds, as they are referred to, arose after an amendment to the federal laws governing the distribution of highway monies. As stated in the Innovative Finance Quarterly, Vol. 3, No. 2, cited above:
 Prior to 1995, states could use their Federal highway grants to repay only the principal component of debt service on most projects. This restrictive rule was out of sync with the cash requirements that stem from real-world bond issues, since the predominant component of debt service during the early years of debt retirement is interest expense.
 Section 311 of the National Highway System Designation Act of 1995 changed the rule by conferring Federal-aid eligibility on a wide array of bond-related costs. Specifically, a state may use future obligations of Federal-aid funds to reimburse the retirement of principal and payment of interest, issuance, insurance, and other costs incidental to the sale of an eligible debt financing instrument.
Id. at 1.
The codification of Section 311 of the "National Highway System Designation Act of 1995" appears at Title 23 U.S.C. § 122 (Supp. 1998). It provides as follows:
 (a) Definition of eligible debt financing instrument. — In this section, the term `eligible debt financing instrument,' means a bond or other debt financing instrument, including a note, certificate, mortgage, or lease agreement, issued by a State or political subdivision of a State or a public authority, the proceeds of which are used for an eligible project under this title.
 (b) Federal reimbursement. — Subject to subsections (c) and (d), the Secretary may reimburse a State for expenses and costs incurred by the State or a political subdivision of the State and reimburse a public authority for expenses and costs incurred by the public authority for —
(1) interest payments under an eligible debt financing instrument;
 (2) the retirement of principal of an eligible debt financing instrument;
(3) the cost of the issuance of an eligible debt financing instrument;
 (4) the cost of insurance for an eligible debt financing instrument; and
 (5) any other cost incidental to the sale of an eligible debt financing instrument (as determined by the Secretary).
 (c) Conditions on payment. — The Secretary may reimburse a State or public authority under subsection (b) with respect to a project funded by an eligible debt financing instrument after the State or public authority has complied with this title with respect to the project to the extent and in the manner that would be required if payment were to be made under section 121.
 (d) Federal share. — The Federal share of the cost of a project payable under this section shall not exceed the Federal share of the cost of the project as determined under section 120.
 (e) Statutory construction. — Notwithstanding any other provision of law, the eligibility of an eligible debt financing instrument for reimbursement under subsection (b) shall not —
 (1) constitute a commitment, guarantee, or obligation on the part of the United States to provide for payment of principal or interest on the eligible debt financing instrument; or
 (2) create any right of a third party against the United States for payment under the eligible debt financing instrument.
This section contemplates "reimbursement" to the state for its expenses in issuing an "eligible debt financing instrument." It also makes reference to the "federal share," of the project, which is determined in compliance with 23 U.S.C. § 120 (ranging from 80% to 100% depending upon the project). It is not entirely accurate to say, therefore, as you do in your request, that the "issuance of GARVEE Bonds and the repayment of same involve neither state taxes nor other state revenue." This will, in all likelihood, not be true in most cases.
That being said, I may now proceed to address the state law surrounding your questions.
Your first question inquires about the applicability of Arkansas Constitution, art. 16, § 1, which provides in pertinent part that:
 Neither the State nor any city, county, town or other municipality in this State shall ever lend its credit for any purpose whatever. . . .
In my opinion, as long as the Highway Commission proposes to issue the GARVEE bonds to raise funds for the benefit of the public highways in the state, it will not run afoul of art. 16, § 1. It has been held that this proscription is against the state lending its credit to other agencies, and that it does not proscribe the state from using its credit for its own purposes. In this regard, the following has been stated:
 The act of the Legislature under consideration does not violate the first subdivision of this section 1 of article 16 of the Constitution, because the act does not contemplate any loan of the State's credit. No ordinary definition of the word `loan,' nor ordinary construction of the language of the clause in which it appears, can make it cover the act which the State is here seeking to do. The State is not lending its credit, but is proposing to use its credit for its own purposes. The State is not undertaking, in any manner, to assume any obligation for any purpose other than its own use, and this use of its credit can not be called a loan thereof. The construction of the language employed, which we think is ambiguous, is reinforced by a consideration of the contemporaneous history, which discloses the evil against which the Constitution was providing. The State had loaned its credit, whether employed for its own use, or loaned in promotion of interests that it had undertaken to foster. It appears that the Constitution-makers have employed a word which denies to the State the right to permit another agency to use its credit, but which does not deny the State its right to use this credit for its own purposes.
Hays v. McDaniel, State Treasurer, 130 Ark. 52, 196 S.W. 134 (1917). Seealso Beaumont v. Faubus, Governor, 239 Ark. 801, 394 S.W.2d 478 (1965).
Again, a definitive answer to the question would require reference to all the facts. In my opinion, however, if the bonds are issued by the state or a state entity and the proceeds are to fund improvements to the state's public highways, an unlawful loaning of the state's credit will be unlikely.
In my opinion, your second and third questions, which involve Amendment 20, are more problematic. Amendment 20 to the Arkansas Constitution provides as follows:
 Bonds prohibited except when approved by majority vote of electors. — Except for the purpose of refunding the existing outstanding indebtedness of the State and for assuming and refunding valid outstanding road improvement district bonds, the State of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the State voting on the question at a general election or at a special election called for that purpose.
This provision requires a public vote prior to the issuance of bonds or other evidence of indebtedness for which the full faith and credit of the state or "any of its revenues" are pledged. Again, it is difficult to analyze the applicability of this provision to a bond issue, the exact contours of which are not before me. Because your questions focus on whether the "revenues" of the state are pledged for purposes of this amendment, I assume you mean to indicate that the "full faith and credit" of the state will not be pledged. Cf. generally, Innovative Finance Quarterly, Vol. 4, No. 3 (discussing various state "backstop" funding sources for GARVEE bonds). Your question focuses on whether "monies allocated to [your] agency from the Highway Trust Fund [are] considered State `revenues'" for purposes of Amendment 20. "It must be remembered that Amendment 20 applies not only to evidence of indebtedness for which the State's faith and credit is pledged, but also to evidence of indebtedness for which any of its revenue is pledged." Borchert v.Scott, 248 Ark. 1041, 1049, 460 S.W.2d 28 (1970).
I have found no helpful caselaw, Attorney General opinion, or legal text from this jurisdiction or any other discussing whether a pledge of federal highway revenues (distributed to a state) falls within a prohibition similar to Amendment 20. Although the issue is not entirely clear, it appears that the GARVEE bond concept contemplates some expenditure of state funds that would then be "reimbursed" by the federal government. The GARVEE concept also appears to require a non-federal state share of revenues. You do not indicate, however, that any state funds will be "pledged" to the repayment of bonds. Again, the answer to your questions may depend upon the actual structure of the bond issue. In any event, it appears under current law that the federal revenues would become state "revenues" for purposes of Amendment 20 upon their "reimbursement" to the state.
In this regard, section 19-6-405 of the Arkansas Code enumerates the revenues making up the "State Highway and Transportation Department Fund." That fund includes "federal revenue sharing funds" and "any federal funds which may become available." A separate trust fund is created within this fund, called the "Federal Revenue Sharing State Highway Trust Fund Account." See A.C.A. § 27-70-205. It is composed of federal revenue-sharing funds allocated under 31 U.S.C. § 6702 (from the "Local Government Fiscal Assistance Fund"), and all other federal-revenue sharing funds thereafter received. Both of these funds are held in the state treasury (see A.C.A. § 19-6-401), although this fact is not a prerequisite to a finding that the funds are "revenues" of the state for purposes of Amendment 20. See Borchert, supra. For fiscal year 1998-1999 the Arkansas legislature has appropriated 4.6 million dollars from the Federal Revenue Sharing State Highway Trust Fund Account to the Arkansas State Highway and Transportation Department. See Acts 1997, No. 28, Section 4. Various appropriations are also made for construction and improvement of highways and to participate in "federal grant or reimbursement programs." See Acts 1997, No. 28, § 2.
It is my understanding that these appropriations, particularly the latter, include the monies from the federal "Highway Trust Fund" to which you refer. This particular federal fund (created at 26 U.S.C. § 9503 and comprised of various federal highway-related tax moneys) is apparently not referred to expressly in any Arkansas legislation. Nonetheless "any federal funds which may become available" and any "federal revenue sharing funds" received by the Commission are apparently deposited into the State Highway and Transportation Department Fund, and the Federal Revenue Sharing State Highway Trust Fund, respectively. See A.C.A. §§19-6-405, and 27-70-205. In my opinion, such funds become "revenues" of the state upon such deposit. Cf. Innovative Finance Quarterly, Vol. 4, No. 3 at 2 stating that: "reimbursements of state expenditures . . . effectively transform into state funds upon receipt by the state DOT." Again, the issue may turn upon the facts surrounding a particular bond issue, but in my opinion federal revenues received by the Arkansas Highway Commission or the Arkansas Highway and Transportation Department become "revenues" of the state upon their receipt for purposes of Amendment 20.[1]
The term "revenues of the State," for purposes of Amendment 20, was discussed in Davis v. Phipps, 191 Ark. 298, 85 S.W.2d 1020 (1935), wherein the court stated:
 When we refer to the revenues of the State, we usually mean the annual or periodic yield of taxes, excises, customs, etc., which the state collects and receives into the treasury for public use, but the word `revenues' may be much broader than that, as it may include rent, yield, as of land, profit. It includes annual and periodical rent, profits, interest, or issues of any species of property, real or personal, income.
Id. at 302. The court cited opinions from other jurisdictions defining the phrase "revenue of the State" to "embrace public revenue, whether State or municipal" and "all taxes and assessments imposed by public authority." Also cited was the following definition, "the income that a State collects and receives into its treasury, and [which] is appropriated for the payment of its expenses." Id., citing Gunning v.People, 76 Ill. App. Ct. 574, and Commonwealth v. Brown, 91 Va. 762,21 S.E. 357.
After the Davis v. Phipps decision, the Arkansas Supreme Court decidedState ex rel. Attorney General v. State Board of Education,195 Ark. 222, 112 S.W.2d 18 (1937), in which it held that the moneys arising from the sale of sixteenth section lands (authorized by Congress) could not, under Amendment 20, be pledged to the repayment of bonds of the State Board of Education. There is some indication, therefore, that monies arising from federal sources, once they come under the dominion of the state,[2] are "revenues" for purposes of Amendment 20. See also Mackeyv. McDonald, 255 Ark. 978, 501 S.W.2d 726 (1974) (applying the Arkansas Constitution's "illegal exaction" provision to federal revenue sharing funds).
In my opinion therefore, depending upon the facts surrounding a particular bond issue, the answers to each of your second and third questions is "yes."
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh
[1] In my opinion such revenues do not fall within the provisions of Amendment 65 to the Arkansas Constitution, so as to be issued without an election of the people.
[2] In State ex rel. Attorney General v. State Board of Education, the court made much of the fact that the state was invested with complete discretion as to the expenditure of the funds, and that "no application to Congress was necessary to direct the appropriation of their proceeds."Id. at 236. The conditions on the use of the federal highway money at issue herein is somewhat more complex (see generally, 40 C.J.S. Highways § 177), but in my opinion Amendment 20 is applicable nonetheless. See,e.g., 23 U.S.C. § 145 (noting that the federal reimbursement procedure provided in Chapter 23 is not intended to infringe on the sovereign rights of the states to determine which projects shall be federally financed).